**FREEMAN et al. v. PIERCE et al.**
(No. 8923.)

(Court of Civil Appeals of Texas. Dallas. Dec. 22, 1922. Rehearing Denied March 17, 1923.)

**1. Receivers** ⊜16—**Probable interest in property subject of suit and danger of material injury, conditions for receiver's appointment.**

Probable interest of plaintiff in the property in which he claims a joint interest, the subject of the action, and danger of its being removed or materially injured, are the conditions which, under Rev. St. art. 2128, must concur to entitle him to a receiver for its preservation pendente lite.

**2. Husband and wife** ⊜254—**Land purchased with husband's earning during coverture community estate.**

Land purchased by husband during coverture with funds earned by him at his trade during coverture, though while living apart from his wife, is community estate.

**3. Divorce** ⊜322—**On divorce, parties become tenants in common in former community property.**

What was community property and undisposed of by the decree of divorce is afterwards held by the parties as tenants in common, though standing in the name of the former husband.

**4. Descent and distribution** ⊜26—**Interest of intestate divorced woman descends to only child.**

The half interest by tenancy in common with her former husband, which a divorced woman has in former community property, undisposed of by the divorce decree, descends on her dying intestate to her only child, under Rev. St. art. 2461.

**5. Tenancy in common** ⊜3—**Heir of one becomes tenant in common with survivor.**

The heir of a tenant in common, dying intestate, becomes tenant in common with the surviving cotenant.

**6. Tenancy in common** ⊜15(2)—**Condition for adverse holding between cotenants.**

For limitations to run in favor of a tenant in common against his cotenant, there being a trust relation between them, there must be an openly asserted adverse and sole claim brought to the notice of the cotenant.

**7. Husband and wife** ⊜16—**No adverse possession during coverture.**

A husband's possession of property cannot be adverse to the wife during coverture.

**8. Tenancy in common** ⊜15(7, 8)—**Recording of mortgage of one tenant not notice to cotenant of adverse holding.**

The making of deed of trust by a tenant in common and the recording thereof is not constructive notice to the cotenant of adverse holding by the maker.

**9. Vendor and purchaser** ⊜245—**Finding against innocent purchase of an outstanding interest by reason of an original community estate authorized.**

Where a community estate was converted by divorce into an estate in common and the divorced husband conveyed as an unmarried man and not as survivor of the community, and no child signed with him, and one of the grantees knew grantor had been married twice and had met one of his children, and a complete abstract would have shown purchase of the land by the grantor, taken in his name, when he was married, and a subsequent divorce without division of such community property, leaving an outstanding interest by tenancy in common, which, on the divorced wife's death, descended to her child, whether the grantees were innocent purchasers was at least a question for the jury.

**10. Husband and wife** ⊜273(9)—**Limits on right of survivor to sell community property for community debts.**

While the survivor has right to sell the community property for payment of community

debts, he cannot pay them, and then, after his right to reimbursement from deceased's heirs is barred, sell the property and therefrom reimburse himself.

**11. Tenancy in common ☞3—After divorce and death of one, deceased's heir must join in sale of former community property.**

After divorce, there is no community survivor, so that what was community property, and after divorce without disposition thereof was held by the former spouses as tenants in common, cannot, on death of one intestate, be sold by the other without joinder of deceased's heirs.

**12. Tender ☞24—Payment into court in suit to cancel for fraud not necessary.**

Where tender is actually made and properly pleaded and proven, and the physical and financial status of the parties is such that the decree can fully adjust and protect the rights of all, actual payment into court is not necessary in suit to cancel deed, especially where the record shows tender in any form would have been declined.

**13. Receivers ☞16—Facts held to show probable interest in property.**

Within Rev. St. art. 2128, as to appointment of receiver, facts *held* to show a probable interest in plaintiff and interveners in the property, a half interest in which is sought to be recovered.

**14. Receivers ☞16—Facts held to show danger of property being removed or materially injured.**

Within Rev. St. art. 2128, as to appointment of receiver of property in which plaintiff claims an interest, the fact that there are several producing oil wells and others being drilled on it, places a portion of it in danger of being removed and the remainder in danger of material injury.

Appeal from District Court, Limestone County; A. M. Blackman, Judge.

Suit by Ernest Pierce and others against W. D. Freeman and others, Ben F. Cone and another intervening. From an order appointing a receiver, defendants appeal. Affirmed.

White & White and Stubbs & Walters, all of Mexia, Richard Mays, of Corsicana, Andrews, Streetman, Logue & Mobley, of Houston, and Frank F. Graves, of Houston, for appellants.

W. T. Jackson, C. S. Bradley, and J. E. Bradley, all of Groesbeck, A. B. Rennolds and O. M. Wroe, both of Mexia, and K. C. Barkley, of Houston, for appellees.

SERGEANT, C. J. On February 4, 1882, Gus Pierce and Mary Carey were married in Limestone county, Tex. A few months later a separation took place which became permanent, the parties never seeing or speaking to each other thereafter. On November 7, 1882, their child, Ernest Pierce, was born. On June 11, 1883, J. M. Berry deeded to Gus Pierce the 93¾ acres of land in controversy herein, the deed being filed and recorded April 14, 1886. The consideration for the transfer was $350 cash, being money earned by Gus Pierce while working at the carpenter's trade during the existence of the marriage relation but subsequent to the separation. In 1887 Mary Carey Pierce obtained a divorce from Gus Pierce, but there were no property rights set up or in any way involved in the divorce proceeding. Thereafter, in 1889, Mary Carey Pierce died intestate, leaving Ernest Pierce as her sole heir and who became of age on November 7, 1903. From time to time Gus Pierce had borrowed money, giving deeds of trust on the land as security, and on one occasion leased it and apportioned the money received therefrom among his children by other wives, allotting to Ernest Pierce his proportionate part also. On November 22, 1920, Gus Pierce sold the land to W. D. Freeman, H. W. Freeman, and H. C. Freeman, appellants herein, and kept the entire purchase price therefor after paying off the debts against the property. On January 16, 1922, the Freemans leased 30 acres of this land to the Kirby Petroleum Company, also appellants, conveying to them seven-sixteenths of the oil and gas therein. The latter had drilled several large producing oil wells thereon, and is now engaged in drilling a great many more. Shortly thereafter Ernest Pierce and his half brothers and sister brought suit against appellants and others in the district court of Limestone county, Tex., at Groesbeck, in trespass to try title to the land, claiming an undivided one-half interest therein as the heir at law of his mother, Mary Carey Pierce. He also prayed for the appointment of a receiver to take active charge and control of the property involved during the pendency of the suit. Ben F. Cone and A. B. Rennolds intervened, each claiming an interest by purchase from Ernest Pierce. The case has not been tried on its merits, but on hearing of the application for a receiver the court was of the opinion that only Ernest Pierce and the two interveners had probable grounds for recovery, and that the property was in danger of being lost, removed, and materially injured and, accordingly, granted the application and appointed T. Y. Pickett receiver on May 23, 1922.

On May 15, 1922, while the application was being heard and appellees' attorney was actually engaged in presenting the case, one of the Freemans and his attorney, B. J. Stubbs, went to the sanitarium at Carlsbad, Tex., where Ernest Pierce was fatally ill with consumption, and procured from him a deed to the Freemans covering his interest in the property, paying a $10,000 consider-

ation therefor. He appeared in court on a stretcher shortly thereafter and testified that the deed had been given under representations that his lawyer had sold him out, that his brothers and sister had compromised the case for $10 each, and unless he took what was offered him for the land, which they testified was full value therefor, he would get nothing. He tendered the money back and asked for cancellation of the deed. A few days later, and prior to May 27, 1922, he died, and his heirs became parties in his stead. From the order of the court appointing the receiver, appellants appeal to this court.

[1] Under Revised Statutes, art. 2128:

"Receivers may be appointed by any judge of a court of competent jurisdiction in this state, in the following cases [among others]: In any action * * * between partners or others jointly owning or interested in any property or fund, on application of the plaintiff or any party whose right to or interest in the property or fund or the proceeds thereof is probable, and where it is shown that the property or fund is in danger of being lost, removed or materially injured."

If the heirs and assigns of appellee Ernest Pierce have a probable interest in the subject-matter of this suit, and if such property is in danger of being lost, removed, or materially injured, their right to a receiver for its preservation pendente lite is unquestioned. But, if these two conditions do not exist, the receivership should be vacated.

[2] To reach a proper conclusion, it will be necessary to consider the legal effect of the status of the parties involved at the various stages in the history of the case just outlined. The property was originally purchased by Gus Pierce from J. M. Berry, after the former's marriage to Mary Carey, after the birth of Ernest Pierce, and prior to the granting of the divorce. Under Revised Statutes, art. 4622:

"All property acquired by either the husband or wife during marriage, except that which is the separate property of either one or the other, shall be deemed the common property of the husband and wife. * * *"

As the funds which purchased the land were earned during such coverture by the husband working at his carpenter's trade, the real estate in which they were invested became community. That this is the correct status of the property is also declared by Judge Ocie Speer in section 514 of his "Law of Marital Relations," which reads:

"The community estate is a statutory estate, dependent wholly upon the existence of the marriage of which it is an incident. It is peculiarly a child of the marital union. It begins at the altar and ends at the grave, unless sooner terminated by judicial decree. It continues during the marriage, regardless of the living apart of the spouses, and regardless of the proportionate contributions of the respective partners. All the earnings or acquisitions of either, not separate under the statute, become a part of the community fund. Like the status of the parties, the community estate as such is terminated only upon dissolution of the marriage by death or divorce." Goode v. Jasper, 71 Tex. 48, 9 S. W. 132.

[3] When the marriage relation was dissolved by the divorce of Mary Carey Pierce from Gus Pierce, the property was not disposed of or even involved. Therefore, under the law, it passed from the status of community property into a joint estate of Gus Pierce and Mary Carey Pierce as tenants thereof in common. The wife's equitable title to a one-half interest was not affected by the husband placing the legal title to the entire interest in his own name. The same section of Speer's "Law of Marital Relations" defines the status of the property on such date in the following language:

"After dissolution of the marriage there can be no further community between the parties. If the parties are divorced they become tenants in common in the former community, in the absence of a judicial partition, and are clothed with absolute control and disposition of their separate property. The wife thereafter deals with such property as one of the owners, not as agent or representative of the community or of the husband."

To the same effect are the holdings in Williamson et ux. v. Gore et al. (Tex. Civ. App.) 73 S. W. 563; Goode v. Jasper, supra; Wingo v. Rudder, 103 Tex. 150, 124 S. W. 899.

[4] The one-half interest of Mary Carey Pierce in this property, originally community, afterwards separate in cotenancy, passed by inheritance on her death intestate to her son and only heir, Ernest Pierce. Revised Statutes, art. 2461.

[5-7] From that time on until the land was sold on November 22, 1920, by Gus Pierce to the Freemans, Ernest Pierce and his father were tenants in common, each of an undivided one-half interest in the land, unless the statutes of limitation bar the rights of Ernest Pierce. The relation of trustee and beneficiary between Gus Pierce and Mary Carey Pierce, which came into existence when the land was originally purchased, continued after the granting of the divorce, and, on the death of Mary Carey Pierce, continued to exist between Gus Pierce and Ernest Pierce as the sole heir at law of his mother. Limitation begins to run in favor of one cotenant against another, when a trust relation exists only from the time when the former openly asserts adverse and sole claim to the property and brings knowledge thereof home to his cotenant. Consequently, a claim of adverse holding by Gus Pierce, either made in express words or by acts or conduct indicating clearly such in-

tention, with notice thereof to his wife or son, will set in motion the statute of limitation from such time. But we have searched the records in vain for any adverse claim prior to the sale to the Freemans on November 22, 1920. The testimony of Gus Pierce discloses that he had at no time spoken to his wife, Mary Carey Pierce, after their separation, which was prior to the birth of Ernest Pierce. He testified that when he leased this land he "divided the money with all my children and I gave Ernest some, I gave him his part. What was due him. I have forgotten what it figured." This was more of a recognition of Ernest Pierce's interest in the land than a disavowal thereof. But at no time did Ernest Pierce and his father discuss the former's interest in the land. Limitation therefore began to run against Ernest Pierce on November 22, 1920, when the sale was made to the Freemans, as this was the first notice Ernest Pierce received that his father was holding adversely to him. Nor, in any event, could limitation run against Mary Carey Pierce in favor of Gus Pierce during the marital relation, as a husband's possession cannot be adverse to the wife during coverture. Watkins v. Watkins (Tex. Civ. App.) 119 S. W. 150.

In 7 Ruling Case Law, p. 847, § 41, the rule is expressed as follows:

"Owing to the relation existing between cotenants and the operation of the rule that the possession of each is the possession of all, it is obvious that clearer and more conclusive evidence is required in proof of the adverse character of the possession in such cases than is required as between strangers. The presumption is strongly against every claim by a cotenant by which he seeks to convert the circumstance of an apparently individual possession into an advantage over his associates; and therefore, in the absence of facts showing that a co-tenant in sole possession holds such possession in opposition to the rights in his cotenants, his occupancy will be presumed to be that of a tenant in common, recognizing the cotenancy. In addition to this requirement of the law to the end that greed shall not fatten under the guise of a greater vigilance, every other element necessary to constitute adverse possession must exist. Accordingly, there must also be an express denial by the tenant in sole possession of the title or right to possession of a fellow tenant brought home to the knowledge of the latter, openly and unequivocally; there must also be a disseizin or ouster, with an intention to hold adversely; and the tenant as against whom an adverse title is so asserted must have actual knowledge or notice of the adverse claim."

The Supreme Court of Texas, in Wingo v. Rudder, supra, adheres to the same rule in the following language:

"As long as the survivor holds the community estate and does no act in repudiation of the interests of the heirs of the deceased spouse, he or she holds as tenant in common, and the rule is that the statute of limitation does not run in favor of a tenant in common holding the common property until he has done some act repudiating his relation with his co-tenants."

The Court of Civil Appeals for this district, in an opinion by Chief Justice Lightfoot in Taylor v. Taylor, 26 S. W. 891, also follows this holding and says:

"The claim of appellants, under the statute of limitations, in favor of Robert H. Taylor against appellees presented questions of fact, which were properly submitted to the jury. He being the survivor of the community, and having qualified as such under the statutes, his possession of such property in such right, or as a tenant in common with appellees, would not support the plea of the statute of limitations against them, unless they had notice that he was claiming adversely to them."

To the same effect are the conclusions in Boyd v. Boyd, 176 Ill. 40, 51 N. E. 782, 68 Am. St. Rep. 169, which reads:

"Where a cotenant was a minor when exclusive possession of the lands was taken by his co-tenant, and he knew nothing of his interest in the lands, such possession, however long continued, does not amount to an ouster nor ripen into a prescriptive title until he obtains knowledge of his rights and that the cotenants in possession hold in hostility to him." Syl. 68 Am. St. Rep. 169.

[8] Nor can we say that the giving of the deeds of trust on the land by Gus Pierce to a third party and their recording were such as to put Ernest Pierce on constructive notice that his father's holding was adverse to him. Lynch v. Lynch (Tex. Civ. App.) 130 S. W. 462; White v. McGregor, 92 Tex. 556, 50 S. W. 564, 71 Am. St. Rep. 875; Towery v. Henderson, 60 Tex. 297; Moody v. Butler, 63 Tex. 213; Phillipson v. Flynn, 83 Tex. 580, 19 S. W. 136; Hulvey v. Hulvey, 92 Va. 182, 23 S. E. 235.

[9] Nor are we able to conclude that appellants are innocent purchasers of the property. The testimony of appellant W. D. Freeman shows that he had known Gus Pierce between 25 and 30 years; that there had been business transactions between them; that such appellant knew Gus Pierce had been married more than one time and knew one of his children. He knew when the deed from Gus Pierce was presented to him that its provisions were to the effect that he conveyed as an unmarried man, that he did not convey as survivor of the community estate, and that no children signed the deed with him. The marriage license of Gus Pierce and Mary Carey was of record in Limestone county, as well as their divorce decree. A complete abstract of the title from the office of the county clerk of such county would have shown the existence of the very facts relied on by appellees herein; that of

purchase during coverture and divorce without division of such community estate. Would not an examination of such title have disclosed an outstanding interest in the community estate, and would not an inquiry have located Ernest Pierce as the heir of his mother, in whom that interest rested? Certainly a jury would be justified in finding from such record and circumstances that a reasonably prudent person could have acquired actual knowledge of the true facts by the exercise of due diligence. Root v. Baldwin (Tex. Civ. App.) 52 S. W. 586; McCoy v. Cunningham (Tex. Civ. App.) 65 S. W. 1084; Woodburn v. Town Lot & Improvement Co. (Tex. Civ. App.) 153 S. W. 365.

[10, 11] While the survivor of the community estate has the right to sell community property for the payment of community debts, yet the survivor cannot, long after such debts have been paid and his right to reimbursement from the heirs of the deceased spouse has become barred by limitation, sell such property and from its proceeds reimburse himself for such payment. After divorce, neither husband nor wife is a community survivor, and, even though death of one takes place thereafter, the other cannot then sell the joint estate without the signature of the heirs of the deceased.

The validity of the sale of Ernest Pierce's interest in this land to the Freemans on May 15, 1922, is a question to be determined by the jury. His physical and mental condition, the truth or falsity of the representations made to him, the question of his reliance thereon, of whether or not undue influence was practiced and of the adequacy of the consideration, are all matters of fact on which the jury should pass.

[12] Ordinarily a tender in the pleadings without an actual proffer of the money is insufficient. But where the tender is actually made and properly pleaded and proven, and the physical and financial status of the parties is such that the court's decree can fully adjust and protect the rights of all concerned, the actual payment of the money into court is not necessary. Especially is this so in this case, the record conclusively revealing that a tender in whatever form made would have been declined. In Garza v. Scott, 5 Tex. Civ. App. 289, 24 S. W. 90, the Court of Civil Appeals for the San Antonio District, in an opinion by Associate Justice Neill, says:

"In an action in equity by the defrauded party for a rescission of a sale of land and the cancellation of a deed obtained by fraud, it is not necessary for the plaintiff to tender to the defendant, before instituting his suit, the consideration received by him. In such a case it is sufficient for the plaintiff to offer in his petition to restore to the defendant what he has received, and the rights of the parties can be fully adjusted and protected in the decree to be entered. 1 Bigelow, Fraud, 76, 82; Gould v. Bank, 86 N. Y. 83; Allerton v. Allerton, 50 N. Y. 670. There was an express offer in plaintiffs' petition to restore [to] the defendant Maltzberger the property deeded to him, and this was sufficient, so far as the tender is concerned, to enable them to maintain their equitable action for a rescission of the alleged fraudulent contract. Brown v. Insurance Co., 117 Mass. 479; Gould v. Bank, 86 N. Y. 83."

[13, 14] A consideration of the foregoing compels us to conclude that the heirs of Ernest Pierce and the interveners Ben F. Cone and A. B. Rennolds have a probable interest in the property involved in this suit. The fact that there are several oil wells now on this property actively producing large quantities of oil daily, and that many more are being drilled, renders precarious the interests of appellees in said property and places a portion of it in danger of being removed and the remainder materially injured. Therefore the appointment by the trial court of a receiver to take charge of the property during the pendency of the suit was proper and correct, and its order and action in so doing is here affirmed.

On Motion for Rehearing.

PER CURIAM. At a former day of this term this case was affirmed and the opinion of the court written by the then Chief Justice, Mr. SERGEANT. Exhaustive motions for rehearing have been filed by the appellants, which were supported by able oral argument of counsel. After a careful review of the voluminous record filed in this case, in the light of these motions, we are of the opinion that a correct disposition of the case has been made.

Our attention has been called, however, to some minor errors of fact in the original opinion, and these we shall correct. In the original opinion it was stated that on May 15, 1922, and while the application for a receiver was being heard, one of the parties to this suit and his attorney visited the sanitarium at Carlsbad, Tex., where Ernest Pierce was fatally ill with consumption, and procured from him a deed to the Freemans covering his interest in the property. Our attention is now called to the fact that this trial did not begin until May 17, 1922, and that on May 15th, when this deed was procured, the case was not being heard. This is the record, and we make the correction.

Another error of fact in the opinion is the statement that the said Ernest Pierce, when he testified in the case below, was brought into court on a stretcher. This fact is not shown in the record, though such statement was made by counsel in oral argument, and its correctness was not challenged, and evidently the record was not searched to determine whether this was correct or not.

The opinion, in making a brief review of the testimony of Gus Pierce, stated, in effect, that his testimony disclosed the fact that he

had leased the land in controversy and had divided the proceeds thereof with all his children, including Ernest Pierce, and that "this was more of a recognition of Ernest Pierce's interest in the land than a disavowal thereof." Gus Pierce owned two tracts of land; one known as the home place, and the other known as the "Prairie place." The one known as the "Prairie place" is the land involved in this suit. It was the home place that had been leased and the money so divided, and not the place the title of which is in controversy. As to this latter place, there was no evidence of its having been leased and the money divided among the children; however, this in no way affects the disposition of this case, nor does it lessen the effect of the statement that this was a recognition of the interest of Ernest Pierce in land owned by Gus Pierce.

\ With these corrections noted, the motions for rehearing are overruled.